Fourth Division
March 22, 2007

No. 1-04-3434

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 02 CR 31449 |
| | ) | |
| PHABIAN PRYOR, | ) | Honorable |
| | ) | Joseph G. Kazmierski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Phabian Pryor, was convicted of aggravated vehicular hijacking (720 ILCS 5/18-4(a)(4) (West 2002)) and vehicular hijacking (720 ILCS 5/18-3(a) (West 2002)). The trial court sentenced defendant to two concurrent prison terms of nine years. Defendant now appeals, presenting the following issues for our review: (1) whether the State failed to prove beyond a reasonable doubt that defendant was armed with a firearm; (2) whether the trial court erred in failing to properly respond to a note that the jury sent out during its deliberations; (3) whether defendant's vehicular hijacking conviction must be vacated under Illinois' one-act, one-crime rule, where, based on defendant's contention, it was carved from precisely the same act as the aggravated vehicular hijacking conviction; (4) whether the mittimus

1

should be corrected to reflect defendant's conviction of one count of aggravated vehicular hijacking and one count of vehicular hijacking; and (5) whether defendant's sentence of nine years for vehicular hijacking was excessive.

## BACKGROUND

The record contains the following pertinent facts. Defendant was indicted on two counts of aggravated vehicular hijacking (720 ILCS 5/18-4(a)(4) (West 2002)) and two counts of aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2002)). The State proceeded on the aggravated vehicular hijacking counts. One count alleged that on September 19, 2002, defendant knowingly took a 1996 Chevrolet Cavalier from the person or immediate presence of Marquis Bonner, by the use of force or by threatening the imminent use of force, and that defendant was armed. The other count alleged that on September 19, 2002, defendant knowingly took a 1996 Chevrolet Cavalier from the person or immediate presence of Tamika Bonner "by the use of force or by threatening the imminent use of force and that he carried on or about his person or was otherwise armed with a firearm."

## THE STATE'S CASE

The State's evidence at trial included the testimony of Marquis Bonner, Tamika Bonner and Officer Joseph Hodges. According to Marquis Bonner, sometime after 1:40 a.m., on September 19, 2002, he and Tamika left Tamika's house in the Western suburbs of Chicago to drive to their cousin's house at 79th Street and California Avenue. Tamika drove her car, a green Chevrolet Cavalier. After driving for 10 or 15 minutes on an expressway, Marquis and Tamika realized they were lost so they stopped at a pay phone at a gas station on the corner of 113th or 115th and Halsted

2

Street in order to call her cousin to ask for directions. Tamika got out of the car to call her cousin. When she realized that the phone was not working, she told her brother. Marquis got out of the car to help her. Marquis noticed two men walking around nearby, one of whom Marquis identified as defendant. While Marquis was attempting to use the phone, defendant and his companion walked toward Marquis and Tamika and told Marquis to get in the car. At the same time, defendant pulled a silver object, which appeared to be a gun, from his waistband and pressed it against Marquis's stomach. Marquis testified that the object felt like "a circle object" against his stomach and "he felt like it could have been a gun," but he could not see the entire object. Defendant threatened to shoot Marquis if he did not get in the car. Marquis refused and defendant backed him up against the car and pulled his shirt over his head. Marquis's shirt came off and he ran while his sister ran in the opposite direction.

Marquis ran down the street away from the car, but returned to the gas station a few minutes later and noticed that the car was gone. He recovered his T-shirt and flagged down two nearby police officers. He told them what happened, and the police car took off in the direction that Marquis thought the car had gone. A few minutes later two other police officers picked up Marquis and drove him to the scene where Tamika's car had been crashed. The police took Marquis to a paddy wagon and asked him if the person inside was the same person who took his sister's car. Marquis identified the defendant as the same man who took his sister's car, and he identified the defendant in court.

According to the testimony of Tamika Bonner, in the early morning hours of September 19, 2002, she was going to drop her brother off at their cousin's house at 79th Street and California

Avenue. She was not familiar with the area and, as a result, she and her brother got lost. They stopped at a gas station at 115th and Halsted to call their cousin. Tamika tried to use the telephone. However, the phone was inoperable, so her brother got out of the car to help her. Two men approached them and told them to take a ride with them. When one of the men grabbed her brother's shirt, Tamika ran. She identified the defendant as one of the two men that approached her and her brother that night. She called her father from a pay phone a few blocks away. Tamika's father picked her up, and they drove around looking for her brother. When they could not find him, they went home. After she returned home, she received a phone call from a woman who claimed that Tamika had hit her truck. Later that day Tamika received a phone call from her brother and the police and she went to the police station to view a lineup. Tamika identified the defendant as one of the men who took her car the night before.

According to the testimony of Chicago police officer Joseph Hodges, he and his partner were on patrol on 115th Street in a marked squad car. As they approached Halsted Street they noticed a young African-American, shirtless male trying to flag them down. The man told the officers that he had just been held up by two black males and they drove his car southbound on Halsted Street. The man told the officers that he had been with his sister but he did not know where she was. Officer Hodges told the man to remain where he was and the officers drove off in the direction the man thought the car had gone.

Approximately one minute later, the officers saw a green Chevrolet Cavalier approaching a stoplight at Halsted and 119th Streets. Officer Hodges pulled the police car in front of the Cavalier so that it could not move forward and he saw two black males inside. The driver of the car

4

proceeded to drive the car in reverse attempting to get away. After driving approximately 30 feet in reverse, defendant hit a minivan parked on the street. Both offenders fled on foot. Officer Hodges chased the men on foot while his partner stayed with the Cavalier. Both offenders ran into an alley and then they split up. Officer Hodges chased defendant out of the alley, then defendant turned left on 118th Street, where Officer Hodges lost sight of him for 5 or 10 seconds.

As soon as the offenders exited from the vehicle, Officer Hodges broadcasted a description of the two men over his police radio. When he approached Halsted Street, he saw the defendant run across Halsted and observed another squad car approaching defendant. The other officers had defendant on the ground and Officer Hodges went back through the alley but was unable to find the other offender. Officer Hodges saw defendant in the back of a paddy wagon and he also observed that Marquis Bonner was near the paddy wagon.

Officer Hodges recalled that defendant went to the hospital after the incident, but he did not recall who transported him to the hospital. In addition, he did not recall seeing defendant injured in any way.

PRYOR'S CASE

Keisha Winston testified that on the night of September 19, 2002, several individuals including herself, Ronald Pierre Thatch, and defendant were hanging out and drinking at her residence. At around 2:30 or 3 a.m., Winston, Thatch and defendant left her house and drove around looking to buy marijuana from someone on the street. They saw a couple of men standing around, so Thatch pulled over and defendant got out to ask if they had any marijuana. Defendant disappeared into the alley with the men and then he came running out of the alley. After Winston

observed the defendant running out of the alley, she saw a police car back up and hit defendant, knocking him down and striking him twice. A paddy wagon pulled up and the police put defendant in the paddy wagon. Finally, the police brought a man to the paddy wagon and the man looked up and shook his head.

Winston and her boyfriend went to the police station to get more information, but they were sent home. They observed all of the activity from the car's rearview mirror from approximately one-half block away and defendant's face looked like it was bruised and bleeding when he was put into the paddy wagon.

Thatch testified that he was at Winston's residence with several other people on the night of September 19, 2002, after midnight. They were all drinking and some were smoking marijuana. Around 2:30 a.m., Thatch, Winston and defendant drove around for approximately 30 minutes to look for more marijuana. At around 118th Street and Green, Thatch pulled over and defendant went into the alley with three or four men for 30 or 40 seconds. Defendant then ran out of the alley and was hit by a police car that was chasing him in reverse. Defendant fell to the ground and got up, and the police car hit him again. The police then put defendant in a paddy wagon. Defendant was bleeding, and there was blood on his white tank top. The police brought a man to the paddy wagon and the man looked at defendant and shook his head. Thatch approached the officers to ask about the arrest but they told him to leave before he was arrested. He went to the police station later that night and found out that defendant had been arrested for aggravated vehicular hijacking.

Pryor testified that he was at Keisha Winston's house at around 2:30 or 3 a.m. on September 19, 2002, with her boyfriend Ronald Thatch and several other people. Defendant, Winston and

Thatch left for a few minutes to go find some marijuana. Defendant asked some men standing around on the street if they had any marijuana and the men said they did and they told defendant to follow them into the alley. As soon as defendant bought the marijuana, he saw a police car coming through the alley toward him. Defendant ran in the opposite direction and tried to throw the marijuana away while all of the other men fled. Defendant testified that the police hit him with their car twice as he was trying to run away, and he stumbled and fell the second time he was hit. As a result, he sustained injuries to his face and head.

After he fell the second time, defendant testified that the police beat him up and put him in a paddy wagon. The police brought a man to the paddy wagon, asked him if defendant robbed him or stole his car, and the man said no. The defendant was taken to Roseland Hospital, where he received treatment for his wounds, and then he was taken to the police station. Detectives Craig Levin and Richard Glenky interviewed defendant at the police station regarding the events in the early morning hours of September 19, 2002. Defendant denied telling the detectives that shortly before he was arrested he had sex with a girl named Samantha at 115th or 116th Street and Racine Avenue. Defendant also denied that he told the detectives that he paid $5 for marijuana that he bought from a man at 117th and Halsted Streets. Defendant did state that he told the detectives that he ran away from the police and threw the marijuana in an unknown location so that he would not have it on him.

## THE STATE'S REBUTTAL CASE

Detective Levin was called to testify in the State's rebuttal case. He testified that defendant told him during an interview that, in the early morning hours of September 19, 2002, defendant had

sex with a girl named Samantha near 115th Street and Racine Avenue. Around 3 a.m., defendant decided to purchase some marijuana and left her house.

During the course of the interview, defendant told the detective that he went to 117th and Halsted Streets, met a man and bought $5 worth of marijuana. Shortly after that, the police pulled up, shined a light on defendant, and he ran and threw the marijuana away. After the police apprehended the defendant, they told him he was under arrest for armed robbery and put him in the back of a paddy wagon.

Defendant did not tell Detective Levin that he had been struck by a police car, nor did he tell the detective that the police officers beat him. The detective did not see blood on defendant's tank top, nor did he see any scratches on defendant.

The State also called Officer Gia Czubak to testify. She testified that at 3:41 a.m. on September 19, 2002, she and her partner, Officer Jorovis, received a radio description of a person involved in a hijacking heading northbound from 119th Street. The officers were at 120th and Halsted Streets, and they saw defendant running westbound on 118th across Halsted Street. Officer Czubak parked the police car and her partner chased the defendant. Defendant fell, got up, and continued to run another 30 feet and was taken into custody by Officers Czubak and Jorovis. Officer Czubak did not notice anyone in the alley, did not notice anyone sitting in a car, and did not notice any cars nearby on 118th Street.

A paddy wagon arrived and defendant was placed inside. Officer Czubak stated that no civilians approached the officers to ask about the events that had occurred. Defendant was taken in the paddy wagon to 119th and Halsted Streets where the victim of the hijacking was waiting with

other officers. The victim viewed defendant in the back of the paddy wagon.

After deliberating, the jury found defendant guilty of the aggravated vehicular hijacking of Marquis Bonner and the vehicular hijacking of Tamika Bonner. The trial court denied defendant's motion for a new trial and arrest of judgment. At the conclusion of the sentencing hearing, the trial court sentenced defendant to two concurrent prison terms of nine years. The trial court denied defendant's motion to reduce his sentence and defendant filed this timely appeal.

ANALYSIS

A. Failure of Proof Beyond a Reasonable Doubt

Defendant first contends that the State failed to prove that he carried on his person, a firearm, because one witness testified at trial that he was not sure if defendant had a gun and the other witness testified that she did not see a gun. Defendant asks this court to reduce defendant's aggravated vehicular hijacking conviction to vehicular hijacking and impose the appropriate sentence.

When considering a challenge to the sufficiency of the evidence on appeal, it is not the function of the reviewing court to retry the defendant. People v. Collins, 106 Ill. 2d 237, 261 (1985). Rather, the relevant question is " 'whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " People v. Perez, 189 Ill. 2d 254, 265-66 (2000), quoting People v. Taylor, 186 Ill. 2d 439, 445 (1999). The weight to be given the witnesses' testimony, the witnesses' credibility, and the reasonable inferences to be drawn from the evidence are all the responsibility of the fact finder. People v. Steidl, 142 Ill. 2d 204, 226 (1991). In addition, circumstantial evidence

9

is sufficient to sustain a criminal conviction, so long as the elements of the crime have been proven beyond a reasonable doubt. People v. Hall, 194 Ill. 2d 305, 330 (2000); People v. Gilliam, 172 Ill. 2d 484, 515 (1996). "The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." Hall, 194 Ill. 2d at 330. Defendant argues that the State failed to prove that he had committed vehicular hijacking while armed with a gun. 720 ILCS 5/18-4(a)(4) (West 2002). Here, defendant maintains that, because his claim that he was not proven guilty beyond a reasonable doubt does not entail any assessment of the credibility of witnesses, but only the question of whether a settled set of facts sufficed to meet the reasonable doubt standard, such a claim presents purely a question of law, which this court reviews *de novo*. We must reject defendant's argument. Defendant maintains that the facts *do not* establish that he was armed with a firearm. The State contends that the witnesses' testimony coupled with other circumstantial evidence established that defendant was armed when he took Tamika's car. By questioning whether the evidence proved an element of the offense of aggravated vehicular hijacking, defendant is challenging the sufficiency of the evidence at trial and the factual findings of the jury; therefore, the issue presented is a question of fact and not of law. It is axiomatic that the State can rely upon circumstantial evidence to prove defendant's guilt. People v. Williams, 40 Ill. 2d 522, 526 (1968); People v. Kelley, 338 Ill. App. 3d 273, 278 (2003). Moreover, where the evidence presented at trial produces conflicting inferences, the trier of fact resolves the conflict. People v. McDonald, 168 Ill. 2d 420, 447 (1995).

Defendant contends that the evidence at trial did not prove beyond a reasonable doubt that

he was armed with a gun while committing the crime of vehicular hijacking. Defendant further asserts that the jury rendered a guilty verdict without any competent evidence that he used a gun during the crime. We reject defendant's contention. It is well settled that proof of the existence or use of a dangerous weapon can be established by circumstantial evidence. People v. Partee, 157 Ill. App. 3d 231, 266 (1987); People v. Myatt, 66 Ill. App. 3d 642, 646, (1978); People v. Rice, 109 Ill. App. 2d 391, 395 (1969); see also People v. Harrison, 359 Ill. 295, 299 (1935). The trier of fact is entitled to rely on circumstantial evidence to establish that a dangerous weapon was used. People v. Willis, 241 Ill. App. 3d 790, 796 (1992); see also People v. Dupree, 69 Ill. App. 3d 260, 264 (1979) (conviction for armed robbery may be sustained even though the weapon was neither seen nor accurately described by the victim).

The prosecution presented sufficient circumstantial evidence that defendant was armed with a gun. Marquis testified that he saw defendant holding a silver object which appeared to be a gun. Marquis further testified that when defendant pressed the object against his stomach, it felt like "a circle object" and "felt like it could have been a gun." Finally, Marquis testified that defendant threatened to shoot him.

Similarly, in People v. Chapman, 94 Ill. App. 3d 602 (1981), defendant, convicted of armed robbery, argued that the State was unable to prove that he used a weapon during the commission of the crime. As in the instant case, the victim in Chapman testified that she saw "a dark brown metal object which she thought was a gun," and she also saw "the cylinder of the gun." Chapman, 94 Ill. App. 3d at 606. The Chapman court held that the victim's testimony provided sufficient evidence for a jury to determine that a dangerous weapon was used in the commission of the crime.

11

The aforementioned cases make it clear that the presence of a dangerous weapon can be established by circumstantial evidence. Applying these principles to the instant case, we conclude that there was sufficient evidence for the jury to find that defendant was armed with a gun while committing the crime of vehicular hijacking. Defendant threatened to shoot Marquis, and when defendant pressed an object against his stomach, Marquis said it felt like "a circle object." Further, defendant's testimony was unworthy of belief. According to defendant, he ran out of the alley after buying marijuana at the exact same time that the police happened to be pursuing the two men who hijacked the vehicle from Marquis and Tamika. The marijuana was never recovered from the alley or defendant's person. After viewing the evidence in the light most favorable to the State, we find the jury, the trier of fact, could find the essential elements of the crime beyond a reasonable doubt. Accordingly, we hold that the defendant was found guilty of the crime of aggravated vehicular hijacking beyond a reasonable doubt.

### B. The Trial Court's Response to the Jury Note

### 1. Invited Error

Defendant next challenges the trial court's response to the jury's note which contained a question regarding the aggravated vehicular hijacking charge. During jury deliberations, a question was posed to the court regarding the State's burden of proof for the offense of aggravated vehicular hijacking. The court responded by notifying the jury that they had all of the law and evidence and to continue to deliberate. Defendant maintains that the jury used a subjective standard (the victim's belief) to determine if he was armed with a gun rather than the standard of whether he was actually armed with a gun. Defendant asks this court to reverse his conviction for aggravated vehicular

hijacking and remand for a new trial.

The State initially responds that defendant has waived any argument regarding the trial court's response to the jury note by failing to object to the court's response at trial. We agree. The record shows that during deliberations, the jury submitted a question to the judge requesting clarification of the State's burden of proof for the offense of aggravated vehicular hijacking. The following discussion occurred:

> "Assistant State's Attorney: The State's response, your Honor, our suggestion will be that they have heard all of the evidence and they have the law, to please continue to deliberate.
>
> Defense Counsel: Exactly what I would have said Judge.
>
> THE COURT: Hmm, hmm.
>
> Assistant State's Attorney: We agree.
>
> THE COURT: Would either side want me to say something in addition to that, like something to the effect that this is for you to decide, that's already in the instructions. You have all the law and the evidence, you may continue to deliberate.
>
> Defense Counsel: Fine.
>
> Assistant State's Attorney: Yes.
>
> THE COURT: You have all the law and evidence, please continue to deliberate.
>
> Defense Counsel: Fine."

13

This colloquy establishes acquiescence, which is beyond mere waiver. Under the doctrine of invited error, an accused may not request that the trial court proceed in one manner and then later contend on appeal that the trial court's course of action was in error. See People v. Carter, 208 Ill. 2d 309, 319 (2003); People v. Villarreal, 198 Ill. 2d 209, 227 (2001); People v. Lowe, 153 Ill. 2d 195 (1992); People v. Segoviano, 189 Ill. 2d 228, 240-41 (2000). The purpose of the invited error rule is to prohibit a defendant from unfairly obtaining a second trial on the basis of error that he injected into the proceedings. People v. Cortes, 181 Ill. 2d 249, 283 (1998), citing Ervin v. Sears, Roebuck & Co., 65 Ill. 2d 140, 144 (1976). To allow a defendant to object, on appeal, to the trial court's response to the jury's question that he agreed to at trial would offend all notions of fair play. Carter, 208 Ill. 2d at 319.

In Carter, defendant was charged with first degree murder for shooting and killing his neighbor. The defendant testified that while he did shoot at the victim, he did not intend to kill him. The trial court asked defendant if he wanted the jury to be instructed on involuntary manslaughter and he said he did not, even though his attorney wanted the jury to be so instructed. On appeal, the defendant raised the failure of the trial court to instruct the jury on involuntary manslaughter as an issue. Defendant's conviction was affirmed, and in its holding, our supreme court cited the doctrine of invited error. Action taken at defendant's request precludes defendant from raising the requested course of conduct as error on appeal. Carter, 208 Ill. 2d at 319. Like the defendant in Carter, the defendant in this case acquiesced when he failed to object to the trial court's proposed response to the jury's question. Accordingly, he may not complain about the trial court's response in this appeal.

2. Ineffective Assistance of Counsel

Alternatively, defendant contends that he received ineffective assistance of counsel when his trial counsel failed to request a proper response to the jury's question. To show ineffective assistance of counsel, a defendant must first show that his counsel's performance fell below an objective standard of reasonableness. This requires showing that counsel made errors so serious that: (1) counsel was not functioning as the counsel guaranteed the defendant by the sixth amendment, and (2) counsel's poor performance must have resulted in prejudice to the defendant, *i.e.*, counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). A defendant must satisfy both prongs of the Strickland test, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. People v. Patterson, 192 Ill. 2d 93, 107 (2000). Defendant has failed to show prejudice or that there is a reasonable probability that, but for counsel's agreement to the trial court's response to the jury's question, the result of the proceedings would have been different. Defendant has also failed to show that counsel's performance was so inadequate and his errors so serious that he was not functioning as the counsel guaranteed by the sixth amendment. People v. Smith, 195 Ill. 2d 179, 188 (2000). In the instant case, defendant failed to satisfy either prong of the Strickland test; therefore, his argument does not support his claim of ineffective assistance of counsel. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064 .

C. One-Act, One-Crime Rule

Defendant next contends that since he took only one car, one time, one of his two convictions was improper. He asks this court to vacate his conviction for vehicular hijacking and,

based thereon, to issue a corrected mittimus. The State initially responds that defendant waived review of multiple convictions arising from a single act because he failed to raise it in the trial court. Defendant states that trial counsel's failure to raise this issue below affects defendant's substantial rights and, therefore, constitutes plain error. The plain error doctrine allows a reviewing court to consider a trial error which has been defaulted because it was not properly preserved under two limited circumstances: "(1) where the evidence in a criminal case is closely balanced, or (2) where the error is so fundamental and of such magnitude that the accused was denied a right to a fair trial." People v. Harvey, 211 Ill. 2d 368, 387 (2004).

It is well settled that a claim that multiple convictions were improper can be waived by failing to raise the issue before the trial court. People v. Gray, 171 Ill. App. 3d 860, 865-66 (1988). The record shows, and defendant concedes, that he did not preserve the issue below, and therefore, it is waived. However, we will explore the plain error claim. Prior to discussing plain error, we first determine whether any error occurred at all. See, *e.g.* People v. Sims, 192 Ill. 2d 592, 621-23 (2000); People v. Wade, 131 Ill. 2d 370, 375-76 (1989).

Relying on the one-act, one-crime rule of People v. King, 66 Ill. 2d 551 (1977), defendant argues that his conviction for vehicular hijacking should be vacated because his convictions for aggravated vehicular hijacking and vehicular hijacking were based on one act: stealing one car. Distinguishing this case from King, the State argues that defendant was properly convicted of both offenses because this case involves two separate victims.

In King, our supreme court held that prejudice results to a defendant only in those cases where more than one offense is carved from the same physical act. King defined an act as "any

16

overt or outward manifestation which will support a different offense." King, 66 Ill. 2d at 566. Analysis under King requires two steps. We must first determine whether defendant's conduct was a single physical act or consisted of separate acts. If we determine that defendant's conduct consisted of separate acts, we must then consider whether the multiple convictions are lesser included offenses. Multiple convictions are improper only where there is a single physical act or the convictions arise from lesser included offenses. People v. Rodriguez, 169 Ill. 2d 183, 186 (1996); People v. Pearson, 331 Ill. App. 3d 312, 321-22 (2002). According to defendant: "In determining whether the charges arise out of the same act, the court need only look at the physical act involved."

Defendant's assertion ignores the number of victims in this case. Our supreme court long ago distinguished King, explaining that crimes committed against separate victims constitute separate criminal acts. People v. Thomas, 67 Ill. 2d 388, 389-90 (1977), citing People v. Butler, 64 Ill. 2d 485 (1976). Where a single act injures multiple victims, the consequences affect, separately, each person injured. Thus, there is a corresponding number of distinct offenses for which a defendant may be convicted. People v. Gard, 236 Ill. App. 3d 1001, 1013-14 (1992). "In Illinois it is well settled that separate victims require separate convictions and sentences." People v. Shum, 117 Ill. 2d 317, 363 (1987).

In the instant case, there are two victims. Both Marquis and Tamika Bonner were threatened by defendant. Both were told to get in the car and take a ride with defendant and his partner. Each victim was subjected to the taking of the car by force. Since there are two separate victims, there are two separate acts and, therefore, because the convictions do not arise from lesser included

17

offenses, separate convictions and concurrent sentences are proper.

However, defendant argues that the aggravated vehicular hijacking statute (720 ILCS 5/18-4(a) (West 2002)) provides for only one conviction for a taking of a motor vehicle, regardless of the number of vehicles. The State argues that the plain language of the statute does not preclude multiple convictions based on multiple victims during a single incident.

The controlling principles are familiar. The cardinal rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. In determining the legislative intent, a court should first consider the statutory language. A court must consider the entire statute and interpret each of its relevant parts together. Where the statutory language is clear, it will be given effect without resort to other interpretive aids. However, where the statutory language is ambiguous, a court may consider other interpretive aids, such as legislative history, to resolve the ambiguity and determine legislative intent. People v. Maggette, 195 Ill. 2d 336, 348 (2001) (and cases cited therein).

Section 18-3 of the Criminal Code of 1961 (Code) defines vehicular hijacking as follows: "A person commits vehicular hijacking when he or she takes a motor vehicle from *the person or immediate presence of another* by the use of force or by threatening the imminent use of force." (Emphasis added.) 720 ILCS 5/18-3(a) (West 2002). Section 18-4(a) of the Code provides that a person commits aggravated vehicular hijacking when he or she violates section 18-3 and, *inter alia*, he or she carries on or about his or her person, or is otherwise armed with, a firearm. 720 ILCS 5/18-4(a)(4) (West 2002). Section 2-15 of the Code defines a "person" as an "individual" or a legal entity. 720 ILCS 5/2-15 (West 2002). The Code further defines "another" as a *person or persons*

as defined in the Code other than the offender. 720 ILCS 5/2-3 (West 2002). Thus, "another" likewise refers to an "individual."

Defendant argues that the vehicular hijacking statute "focuses on the taking of a particular type of property, a motor vehicle, rather than the person from whom the property is taken," and that " it is the act of taking under the specified circumstances that constitutes the offense." Defendant's argument might have merit only if the vehicular hijacking statute were phrased as being committed against "one or more persons," such as in the home invasion statute. 720 ILCS 5/12-11(a) (West 2002)[1]. Our courts have long construed this language as indicating that only one offense can be carved from one entry in a home invasion, regardless of the number of victims within the dwelling. Through this statutory language, the legislature focused on the entry aspect of the offense, rather than the number of victims. See People v. Cole, 172 Ill. 2d 85, 102 (1996); People v. Sims, 167 Ill. 2d 483, 522-23 (1995). If the legislature had phrased the vehicular hijacking statute as being committed against "persons," then the intent would be that only one offense can be carved from one taking, despite multiple victims.

However, this is not the statutory language at issue in the instant case. The plain language of the vehicular hijacking statute is phrased as being committed against an individual. Our courts have long construed similar language in the robbery statute (720 ILCS 5/18-1(a) (West 2002)) as allowing a separate count for each victim. See, *e.g.*, Butler, 64 Ill. 2d at 488-89; People v.

---

[1]The home invasion statute provides in pertinent part: "A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has a reason to know that <u>one or more persons</u> is present ***. " (Emphasis added.) 720 ILCS 5/12-11(a) (West 2002).

Morrison, 137 Ill. App. 3d 171, 178 (1985). Section 2-3 of the Code clearly defines "another" as a person or persons other than the offender. 720 ILCS 5/2-3 (West 2002). Section 18-3 of the Code provides that a person commits vehicular hijacking when he or she takes a motor vehicle from the *person or immediate presence of another* by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-3(a) (West 2002).[2] Tamika is the "person" ("individual" as defined in the Code) from whom the car was taken because it was her car and she was threatened. The car was also taken from the presence of "another" and that was Marquis. The vehicle was in Marquis's immediate presence and he was threatened with what he believed to be a gun. Although the convictions resulted from the same physical act, two people were separately victimized in this case and the trial court correctly entered two convictions. Therefore, we reject defendant's argument.

In his reply brief, defendant argues that "the appropriate number of judgments and sentences the court may impose for aggravated vehicular hijacking depends on how many 'takings' occurred rather than how many victims were present. Because only one car was taken, only one conviction can stand." We disagree. The statute clearly provides that a person commits aggravated vehicular hijacking when he or she violates section 18-3 and, *inter alia*, he or she carries on or about his or her person, or is otherwise armed with, a firearm. 720 ILCS 5/18-4(a)(4) (West 2002). Section 18-3 provides that "[a] person commits vehicular hijacking when he or she takes a motor vehicle from the *person or immediate presence of another* by the use of force or by threatening the

---

[2] With an exception not pertinent to the instant case (see People v. Cooksey, 309 Ill. App. 3d 839 (1999)), the language of the vehicular hijacking statute employs "the same language that we have in terms of robbery." 88th Ill. Gen. Assem., Senate Proceedings, April 15, 1993, at 283 (statements of Senator Hawkinson).

imminent use of force." (Emphasis added.) 720 ILCS 5/18-3(a) (West 2002). The statute does *not* provide that punishment for committing aggravated vehicular hijacking depends upon how many takings occurred.

Defendant also argues that the analogy "to cases involving crimes against persons is irrelevant and should fail because crimes against persons focus on injury and death, rather than the issue in this case, the taking of property." This contention not only ignores the plain language of the vehicular hijacking statute, but also ignores "the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." People v. Frieberg, 147 Ill. 2d 326, 345 (1992). During the legislative debates on what would become Public Act 88-351, the sponsor of the bill, Senator Hawkinson, explained as follows: "Unfortunately, in our society from time to time a new - - new genre of crimes comes along. We're all to familiar with the tragedies around the country of - - of car hijacking where someone armed or unarmed attacks a car, and either snatches the driver out; sometimes the driver, as we read yesterday about one story, is dragged, because they're caught in the rush, and - - and caught a seat belt or something and dragged and seriously injured or killed; sometimes these carjackings occur where a young child is the passenger in the car and is taken for ride after a mother or father is - - is yanked from the car." 88th Ill. Gen. Assem., Senate Proceedings, April 15, 1993, at 281 (statements of Senator Hawkinson). This explanation of the reason, necessity, or purpose of the vehicular hijacking statute has more to do with the injury to the victim than the taking of property. Where a single act injures multiple victims, the consequences affect, separately, each person injured. Butler, 64 Ill. 2d at 489; Gard, 236 Ill. App. 3d at 1013-14.

21

Although only one vehicle was taken, crimes were committed against two separate individuals. Therefore, two separate convictions will stand and the one-act, one-crime rule does not apply. Having found no error, there can be no plain error. See, *e.g.,* People v. Nicholas, 218 Ill. 2d 104, 121 (2005).

### D. Mittimus

Defendant asks this court to order the issuance of a corrected mittimus indicating one conviction for each vehicular hijacking and aggravated vehicular hijacking. Both the defendant and the State agree that the mittimus does not reflect defendant's convictions of one count of aggravated vehicular hijacking of Marquis Bonner and one count of vehicular hijacking of Tamika Bonner. Where the mittimus incorrectly reflects the jury's verdict, the proper remedy is to amend the order to conform to the judgment entered by the court. People v. Brown, 255 Ill. App. 3d 425, 438 (1993). Pursuant to Supreme Court Rule 615(b), this court may correct the mittimus without remanding the case to the trial court (134 Ill. 2d R. 615(b)). People v. Mitchell, 234 Ill. App. 3d 912, 921 (1992); People v. Casiano, 212 Ill. App. 3d 680, 690 (1991). Accordingly, the mittimus shall be corrected to reflect defendant's convictions of one count of aggravated vehicular hijacking of Marquis Bonner and one count of vehicular hijacking of Tamika Bonner.

### E. Excessive Sentence

Defendant argues that the sentence imposed by the trial court was excessive and the trial judge abused his discretion by failing to consider mitigating factors in defendant's favor and defendant's potential for rehabilitation. Defendant asks this court to reduce his sentence for vehicular hijacking to a sentence more in accordance with his potential for rehabilitation. It is long

settled that the trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. People v. Jones, 168 Ill. 2d 367, 373 (1995); People v. Bowman, 357 Ill. App. 3d 290, 303 (2005); People v. Matthews, 306 Ill. App. 3d 472, 484 (1999). Illinois courts have repeatedly emphasized the undesirability of a reviewing court substituting its judgment or preference as to punishment for that of the sentencing court. People v. Hicks, 101 Ill. 2d 366, 375 (1984); People v. Pittman, 93 Ill. 2d 169, 178 (1982); People v. Vance, 76 Ill. 2d 171, 182 (1979). Where the sentence chosen by the trial court is within the statutory range permissible for the crime for which the defendant was charged, that sentence may not be disturbed absent an abuse of discretion. Jones, 168 Ill. 2d at 373-74.

In the instant case, defendant's sentences were within the statutory range. Section 18-4(b) of the Criminal Code of 1961 provides that aggravated vehicular hijacking with a firearm is a Class X felony, which carries a term of not less than seven years. 720 ILCS 5/18-4(b) (West 2002). Under section 5-8-1(a)(3) of the Unified Code of Corrections, a Class X felony must not carry a sentence of more than 30 years. 730 ILCS 5/5-8-1(a)(3)(West 2002). Defendant's sentence of nine years for aggravated vehicular hijacking was two years over the minimum sentence and 21 years under the maximum sentence. Section 5-8-1(a)(4) of the Unified Code of Corrections provides that vehicular hijacking, defendant's other conviction, is a Class 1 felony, which carries a sentence of 4 to 15 years. 730 ILCS 5/5-8-1(a)(4)(West 2002). Defendant's sentence of nine years for vehicular hijacking is five years above the minimum term and six years below the maximum.

The court specifically noted in the record that defendant was found guilty of count I of the

23

indictment, the charge of aggravated vehicular hijacking, and count II of the indictment, the lesser included offense of vehicular hijacking. The court further noted that based upon the nature of those charges, it did not believe that the minimum sentence was warranted in this case. After carefully reviewing the record, we conclude that the trial court did not abuse its discretion in sentencing defendant to two concurrent prison terms of nine years.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. The mittimus shall be corrected to reflect defendant's convictions of one count of aggravated vehicular hijacking of Marquis Bonner and one count of vehicular hijacking of Tamika Bonner.

Affirmed; mittimus corrected.

QUINN, P.J., and MURPHY, J., concur.